Mark J. Werksman, Esq. (State Bar No. 120767)
Kelly C. Quinn, Esq. (State Bar No. 197697)
Nina E. Daly, Esq. (State Bar No. 248796)
WERKSMAN JACKSON HATHAWAY & QUINN LLP
888 West Sixth Street, Fourth Floor
Los Angeles, California 90017
Telephone: (213) 688-0460
Facsimile: (213) 624-1942

Attorneys for Defendant
ISAAC ZIMERMAN

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE UNITED STATES OF AMERICA, | CASE NO.: 09-CR-00805-VBF |
| Plaintiff, | DEFENDANT ISAAC ZIMERMAN'S OBJECTIONS TO THE PSR AND SENTENCING POSITION; MEMORANDUM OF POINTS AND AUTHORITIES |
| vs. | |
| ISAAC ZIMERMAN, | |
| Defendant. | Hearing Date:   February 8, 2016 Hearing Time:  11:30 am |

TO THE HONORABLE OTIS D. WRIGHT, TO THE UNITED STATES PROBATION OFFICE,  AND TO ASSISTANT UNITED STATES ATTORNEY JOSEPH JOHNS:

# TABLE OF CONTENTS

PAGE(S)

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.   RELEVANT FACTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III.  RESPONSE TO THE GOVERNMENT'S SENTENCING POSITION  . . 10

    A.    OPPOSITION TO THE GOVERNMENT'S REQUEST TO
        DEPART FROM THE GUIDELINES BASED ON FACTS
        OUTSIDE OF THE RECORD . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        1.    THE GOVERNMENT HAS PROVIDED NO BASIS TO
             FOR AN UPWARD DEPARTURE . . . . . . . . . . . . . . . . . . 10

        2.    THE GOVERNMENT'S REQUEST TO DEPART
             FROM THE GUIDELINES BASED ON FACTS
             OUTSIDE OF THE RECORD SHOULD BE BASED
             ON STANDARD HIGHER THAN
             PREPONDERANCE-OF-THE-EVIDENCE . . . . . . . . . . . . 11

    B.    OBJECTION TO THE GOVERNMENT'S
        CHARACTERIZATION OF MR. ZIMMERMAN HAS
        HAVING A "SIGNIFICANT HISTORY OF
        DISREGARD FOR THE LAW" AND A
        "DEMONSTRATED LEVEL OF SOPHISTICATION
        IN DEALING WITH WILDLIFE TRAFFICKING" . . . . . . . . . . . 13

IV.   SENTENCE CALCULATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    A.    SECTION 3553(A) FACTORS CONCERNING THE
        HISTORY AND CHARACTERISTICS OF MR. ZIMERMAN
        WARRANT A PROBATIONARY SENTENCE . . . . . . . . . . . . . . 16

    B.    SECTION 3553 FACTORS CONCERNING THE NEED FOR
        THE SENTENCE IMPOSED . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        1.    THE SERIOUSNESS OF THE OFFENSE AND THE
             NEED TO PROVIDE JUST PUNISHMENT  . . . . . . . . . . . 17

        2.    THERE IS NO NEED TO PROTECT SOCIETY FROM
             FUTURE CRIMES OF MR. ZIMERMAN AND
             CUSTODY TIME IS NOT NECESSARY TO ACHIEVE
             DETERRENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    C.    THE TYPES OF SENTENCES AVAILABLE . . . . . . . . . . . . . . . 19

V.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

# TABLE OF AUTHORITIES

**PAGE(S)**

**U.S. SUPREME COURT CASES**

*Gall v. United States*
  552 U.S. 38 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Kinder v. United States*
  504 U.S. 946 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Kimbrough v. United States*
  552 U.S. 85 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*McMillan v. Pennsylvania*
  477 U.S. 79 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Watts*
  519 U.S. 148 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Wilson*
  503 U.S. 329 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22


**FEDERAL CASES**

*Dutton v. U.S. Attorney General*
  713 F. Supp. 2d 194 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Simon v. United States*
  361 F. Supp. 2d 35 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Bram*
  990 F.2d 98 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Carty*
  520 F.3d 984 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Dare*
  425 F.3d 634 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

-ii-

**PAGE(S)**

*United States v. Fernandez-Vidana*

     857 F.2d 673 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Gigante*

     39 F.3d 42 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Howard*

     894 F.2d 1085 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Ifeoluwa*

     238 F. App'x 895 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Restrepo*

     946 F.2d 654 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Townley*

     929 F.2d 365 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Wilson*

     350 F. Supp. 2d 910 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18


**FEDERAL STATUTES**

18 U.S.C. § 554 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 9

18 U.S.C. § 3553 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 10, 17, 18

18 U.S.C. § 3553(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17

18 U.S.C. § 3553(a)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

18 U.S.C. § 3582(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

18 U.S.C. § 3585 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

18 U.S.C. § 3585(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

18 U.S.C. § 3585 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

18 U.S.C. §3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 20

18 U.S.C. §3553(a)(33) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**PAGE(S)**

28 C.F.R. § 0.96 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

28 U.S.C. §994(j) (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

U.S.S.G. § 2Q2.1(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

U.S.S.G. § 3C1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 14

1  **Mark J. Werksman, Esq. (State Bar No. 120767)**
   **Kelly C. Quinn, Esq. (State Bar No. 197697)**
2  **Nina E. Daly, Esq. (State Bar No. 248796)**
   **WERKSMAN JACKSON HATHAWAY & QUINN LLP**
3  **888 West Sixth Street, Fourth Floor**
   **Los Angeles, California 90017**
4  **Telephone: (213) 688-0460**
   **Facsimile: (213) 624-1942**
5
6  **Attorneys for Defendant**
   **ISAAC ZIMERMAN**
7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10

11  THE UNITED STATES OF        )   **CASE NO.: 09-CR-00805-VBF**
    AMERICA,                    )
12                              )   **DEFENDANT ISAAC**
              Plaintiff,        )   **ZIMERMAN'S OBJECTIONS TO**
13                              )   **THE PSR AND SENTENCING**
         vs.                    )   **POSITION; MEMORANDUM OF**
14                              )   **POINTS AND AUTHORITIES**
    ISAAC ZIMERMAN,             )
15                              )
              Defendant.        )   **Hearing Date:  February 8, 2016**
16                              )   **Hearing Time:  11:30 am**
                                )
17                              )
                                )
18  _____)
19

20  **TO THE HONORABLE OTIS D. WRIGHT, TO THE UNITED STATES**
    **PROBATION OFFICE,  AND TO ASSISTANT UNITED STATES**
21  **ATTORNEY JOSEPH JOHNS:**

22       Defendant Isaac Zimerman, by and through his counsel of record,

23  Werksman Jackson Hathaway & Quinn LLP, hereby files his objections to the Pre-

24  Sentence Investigation Report and sentencing position.

25       Mr. Zimerman's position is based upon the factual basis to his plea, the Pre-

26  Sentence Investigation Report, the attached memorandum of points and authorities,

27  all letters and documents filed hereto, and upon any oral argument that shall be

28

                              1

presented at the sentencing hearing pursuant to Federal Rules of Criminal Procedure, Rule 32(c)(1).

DATED: January 29, 2016                    Respectfully submitted,

                                           By: _____
                                               Mark J. Werksman
                                               Kelly C. Quinn
                                               Nina E. Daly
                                               Attorneys for Defendant
                                               Isaac Zimerman

# I.
# INTRODUCTION

On November 10, 2015, Mr. Zimerman pleaded guilty to Count 12 of the Second Superseding Indictment, which alleged a violation of 18 U.S.C. § 554; Smuggling Fish From the United States.  In the plea agreement, both parties agreed to a base level of 6 pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2Q2.1(a); with a two level increase under U.S.S.G. § 2Q2.1(b)(1) for Committing the Crime for Pecuniary Gain; and an additional two level increase under U.S.S.G. § 3C1.1 for Obstruction. The government also agreed to recommend a two or three level decrease in the applicable Sentencing Guidelines offense level at the time of sentencing if the defendant demonstrates acceptance of responsibility.  The defendant agreed not to contest the facts as set forth in the factual basis of the plea agreement. The government agreed not to oppose the defendant's request for sentencing credit in this case for the time he served in a Mexican jail awaiting extradition to the United States. The government further agreed not to oppose the defendant's request to return to Mexico or Israel during the term of any probation or supervised release imposed by the Court post-sentencing, provided that neither the Court nor probation is opposed to such a request.  Both parties reserved the right to argue that additional specific offense characteristics, adjustments, and departures under the Sentencing Guidelines are appropriate and reserved the right to argue for a sentence outside the sentencing range established by the Sentencing Guidelines based on the factors set forth in 18 U.S.C. § 3553.

In the Pre-Sentence Investigation Report ("PSR"), the United States Probation Office ("USPO") computes a total offense level of 8 and recommends that Mr. Zimerman be sentenced to six months in custody, followed by a one year term of supervised release on the condition that he "shall not engage, as whole or

partial owner, employee or otherwise, in any business involving the sale of exotic fish without the express approval of the Probation Officer prior to engaging in such employment and provide access to all business records pertaining to the operation of any business owned, in whole or in part, by the defendant, as directed by the Probation Officer."

On January 26, 2016, the government filed a Sentencing Position for Defendant Isaac Zimerman. In that document, the government agrees with the calculation in the plea, but asks this Court for an upward departure to a sentence which is double the maximum allowed under the guidelines.

For the reasons set forth herein, defendant opposes the government's request and asserts that a probationary, or guideline sentence, is appropriate.

## II.
## RELEVANT FACTS

Isaac Zimerman was born in Mexico City on April 25, 1949. His father worked for a food packing company in Mexico City and his mother was a homemaker.  Mr. Zimerman has one older brother who lives in California and a younger sister who still resides in Mexico.  Growing up, Mr. Zimerman's family struggled in the beginning until his father obtained a more profitable position with his company.  When Mr. Zimerman was seven years old, his maternal aunt died and the family took in her five children and raised them as their own.  Mr. Zimerman attended a private Jewish high school for the poor in Mexico. Following his graduation, he came to the United States to attend San Francisco State University, but was forced to leave after one year due to financial problems. Mr. Zimerman then moved to Israel to attend Hebrew University in Jerusalem, where he graduated with degrees in Communications, Theater, and Philosophy at the age of twenty-six.

While attending Hebrew University, Mr. Zimerman met his wife, of Argentinian descent, who was also studying in Israel at a separate college.  Upon Mr. Zimerman's graduation, the couple returned to Mexico City where they were married in 1977; the couple had three children together.  While living in Mexico City, Mr. Zimerman began an import/export business dealing primarily in electronics.  During these early years, the family frequently vacationed in the United States and in 1989 the family moved to Los Angeles.  For the next few years, Mr. Zimerman tried to run his import/export business from the United States, but his absentee management proved too difficult and the business eventually failed.

From 2000 to 2004, Mr. Zimerman owned and operated a restaurant in Northridge, CA called "El Portal Mexican Restaurant."  Mr. Zimerman not only ran the restaurant with the help of his wife and children, he was also the chef.  Mr. Zimerman eventually closed the business in 2004 when the management of the business became "too much" for the family.

While Mr. Zimerman was running the restaurant, he developed the hobby of collecting tropical fish.  He would keep the fish in his garage at his home in West Hills, California.  As Mr. Zimerman's interest and enthusiasm for this hobby progressed and he eventually began buying, selling, and trading the fish. He started receiving orders from abroad, and began importing and exporting fish, learning the rules of the trade as he went. In 2004, Mr. Zimerman and his wife formed a company in the garage of the family home, River Wonders LLC.  As his fish business continued to grow dramatically, it wasn't long before the business became too big for the garage.  In or around 2007, Mr. Zimerman purchased a small existing tropical fish facility. He expanded and improved it with his own hands, building tank racks and innovative filters by himself. A few years later, he was able to purchase a modern state of the art fish facility in Hawthorne, investing all

his life's savings in the endeavor.  By 2008, what had begun as a hobby, was now one of the largest fish wholesalers in the world, with two thousand fresh water tanks and over 250,000 fish.  That company ended as a result of the current prosecution in 2010.

As the government points out in its sentencing papers, "law enforcement authorities began investigating Mr. Zimerman and River Wonders LLC in August of 2004."  Law enforcement raided the Zimerman's home and seized a number of fish from the garage.  For the next five years thereafter, the government took no action and the River Wonders LLC business continued to thrive.  Five years later, on August 18, 2009, just weeks before the statute of limitations ran on the charges stemming from the 2004 raid, the government charged Mr. Zimerman in a ten count Indictment with various crimes concerning his River Wonders LLC business, including conspiracy, illegal fish trafficking, smuggling fish into the country, and alteration or falsification of documents.  Mr. Zimerman was arrested that same day pursuant to an arrest warrant.  All of the charges in the initial indictment concerned actions that occurred in or before 2004.  Bail was set and Mr. Zimerman was released from custody on a $20,000 unsecured appearance bond five days later.  Mr. Zimerman was not ordered to shut down the River Wonders business as a condition of pretrial release (See Bond and Conditions of Release filed as to Defendant Isaac Zimerman, Terms and Conditions, attached hereto as Exhibit A) and he continued to buy and sell fish through River Wonders LLC.

On December 8, 2009, a First Superseding Indictment was returned, adding two more counts against Mr. Zimerman, one (Count 11) relating to an allegedly false statement made by Mr. Zimerman to an agent of the United States Fish and Wildlife Services ("FWS") five years prior in 2004 and one (Count 12) relating to the exportation of two Arapaima gigas without a re-export cites in 2008. Five months later, on May 14, 2010, a Second Superseding Indictment was returned,

adding yet another count alleging that on March 4, 2010, while Mr. Zmmerman was on pre-trial release, he attempted to export approximately ten legally imported Aripaima gigas from the United States to Canada without a re-export cites permit. The government subsequently requested that Mr. Zimerman's bond be revoked. On June 3, 2010, the court set an Order to Show Cause Hearing Re Bond Status for June 10, 2010.  At the Order to Show Cause Hearing, the Court allowed Mr. Zimerman to remain on bond with the additional conditions 1) that he report weekly to PreTrial Services and 2) that he not directly or indirectly engage in his fish business pending trial, thereby signaling the end of River Wonders LLC.  Trial in the matter was continued to December 7, 2010.

Facing a thirteen count indictment, his business destroyed, and in fear of his bond being revoked, in June of 2010, Mr. Zimerman fled to Mexico.  For the next approximately five years, Mr. Zimerman lived in Toluca, Mexico, under his own name, cut off from his wife and family. While in Mexico, Mr. Zimerman devoted himself, in part to his writing.  Mr. Zimerman writes within the genre of "magical realism," a type of literature that portrays magical or unreal elements as a natural part in an otherwise realistic or mundane environment within the vein of Gabriel Garcia Marquez and Jorge Luis Borges.  Mr. Zimerman has written six books to date, the last of which entitled "El Hombre Cancion" is in the final stages of proofreading and will be the first to be published; the book was completed while defendant was confined to his home on electronic monitoring these past four months.

Mr. Zimerman has always been a skilled artisan.  While in Mexico, he taught complicated glazing and firing techniques to anyone who wished to learn. He also became acquainted with the kamado; an ancient Japanese wood or charcoal fueled, traditionally ceramic, cook stove, often designed for outdoor use. Mr. Zimmerman studied the kamado and came up with his own version of the

cooking vessel made out of clay instead of ceramic construction. (See Picture of a Komado, attached hereto as Exhibit B)  Mr. Zimerman intends to return to Mexico to continue to develop his new kamado design and to eventually build this project into a business.

On March 3, 2015, the Mexican authorities took Mr. Zimerman into custody. He was taken to the notorious Reclusorio Oriente prison just outside Mexico City where he languished for seven and one half long months awaiting extradition to the United States.  Reclusorio Oriente houses the worst of the worst criminals Mexico has to offer.  Drug kingpins run their operations from behind the prison walls. Violent perpetrators make life on the inside precarious at best, and the prison is ripe with corruption.  There were inmates being beaten or killed around every corner in the prison with little, if any, consequence. Originally designed to house around 5,500 prisoners, some reports claim there are now are as many as 12,000 inmates at Reclusorio Oriente.  For seven months Mr. Zimerman was forced to sleep literally "on top of a toilet" while others would strap themselves to the ceiling or prop each other up, back to back, in a circle in order to sleep.

Mr. Zimerman has been diabetic for some time.  He also suffers from atrial fibrillation; an irregular and often rapid heart rate that increases the risk of stroke, heart failure and other heart related problems. Mr. Zimerman underwent cardiac ablation surgery in 2006.  In addition, he suffers from hypertension.  He has a regimen of medications he takes on a daily basis.   The diet in Reclusorio Oriente consisted almost exclusively of rice and beans, which amounted to poison for Mr. Zimmerman.  On a number of occasions, Mr. Zimerman's sugars rose to over 400, which put him in danger of falling into a diabetic coma.  To compound matters, Mr. Zimerman went without medication for long periods of time.  As a result of the lack of medication to regulate his blood sugar, Mr. Zimerman would have to

refrain from eating for days at a time and would consequently become sick from weakness.

On or about September 25, 2015, the Mexican Court refused extradition on the majority of charges Mr. Zimerman was facing and only granted extradition of Mr. Zimerman on two of the thirteen counts: Count 12 and Count 13 of the Second Superseding Indictment.  Mr. Zimerman was extradited to the United States and was ordered detained. Upon arriving in the United States, Mr. Zimerman was immediately hospitalized due to his poor medical condition after being incarcerated in the Mexican jail. Thereafter, he was held in the Metropolitan Detention Center for the next seven weeks.  On November 10, 2015, Mr. Zimerman pleaded guilty to Count 12 of the Second Superseding Indictment, a violation of 18 U.S.C. §554, Smuggling Fish From the United States. He was released pursuant to a $500,000 appearance bond secured by the deed to his home and was placed on home confinement/electronic monitoring with which he has fully complied to date.[1]

/ / /

/ / /

---

[1]  It should be noted that Count 12 of the Superseding Indictment involved the export of two Arapaima gigas, a species of arapaima, which are among the world's largest freshwater fish and are native to the Amazon and Essequibo basins of South America. An important aspect of the international trade in this species is its CITES regulation, which requires that shipments of the fish in and out of the country have to be certified by CITES authorities for both export and import. CITES (the Convention of International Trade in Endangered Species of Wild Fauna and Flora) is an international agreement between governments. Its aim is to ensure that international trade in specimens of wild animals and plants does not threaten their survival. Arapaima gigas are listed in Appendix II of CITES and, as such, require that the import (or export) of any specimen of such a species requires prior grant and presentation of either an export permit or a re-export certificate which shall be granted so long as the fish is imported in accordance with the provisions of CITES and is prepared and shipped so as to minimize the risk of injury, damage to health, or cruel treatment. Mr. Zimerman lawfully imported the two Arapaima gigas but failed to acquire a re-export certificate in order to ship them to Canada.

## III.
## RESPONSE TO THE GOVERNMENT'S SENTENCING POSITION

### A.   OPPOSITION TO THE GOVERNMENT'S REQUEST TO DEPART FROM THE GUIDELINES BASED ON FACTS OUTSIDE OF THE RECORD

In its position papers, the government argues that this Court should depart above the Guideline range and double the maximum Guideline sentence. To support this proposition, the government argues first that Mr. Zimmerman was a "sophisticated fish trafficker who built a successful business based on the illegal possession and sale of wildlife." (Gvt Motion, at 5.)

### 1.   THE GOVERNMENT HAS PROVIDED NO BASIS TO FOR AN UPWARD DEPARTURE

A court may depart from the applicable guideline range if it finds an aggravating circumstance "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that . . . should result in a sentence different from that described." 18 U.S.C. 3553. Chapter 1, Part A of the Guidelines Manual provides:

> The Commission intends the sentencing courts to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted.

Here, the government is not just asking for a simple upward departure or for a high end sentence. Instead, this government is asking this Court to depart so far above the guideline range, that it would double the maximum sentence. The government makes no actual, legal argument that a departure is necessary. Instead,

the government argues, as a general notion, that Mr. Zimmerman should receive a sentence, significantly outside of the maximum set forth by the Sentencing Commission, because Mr. Zimmerman was engaged in a larger pattern of unlawfully selling of fish. As set forth above, Mr. Zimmerman disputes the government's allegation and inference that he was running a business that was "built" on illegal possession of fish.  Instead, Mr. Zimmerman had a thriving business built on selling fish, and the government has pointed to a few, finite violations of California regulations. However, in doing so, the government has failed to point to any real way in which the instant case is outside of the heartland to warrant a departure, nor that there is such a distinction in the instant case which would justify varying so significantly above the guideline range.

### 2. THE GOVERNMENT'S REQUEST TO DEPART FROM THE GUIDELINES BASED ON FACTS OUTSIDE OF THE RECORD SHOULD BE BASED ON STANDARD HIGHER THAN PREPONDERANCE-OF-THE-EVIDENCE

Additionally, in making its argument, the government relies on facts, purported earlier, uncharged violations of California law, which were not agreed to in the plea agreement, and not part of the PSR.

When a party is seeking to use a fact at sentencing not agreed to in the plea agreement, the Ninth Circuit has noted that the party "should bear the burden of proof for any fact that the sentencing court would find necessary to determine the base offense level. Since the government is initially invoking the court's power to incarcerate a person, it should bear the burden of proving the facts necessary to establish the base offense level. After that, the party seeking to alter the base

offense level should bear the burden of proving the necessary facts." *United States v. Howard*, 894 F.2d 1085, 1090 (9th Cir. 1990). Thus, the party asserting the fact has the burden of proof, and "[a]s a general rule, the preponderance of the evidence standard is the appropriate standard for factual findings used for sentencing." *United States v. Dare*, 425 F.3d 634, 642 (9th Cir. 2005); *see also*, *United States v. Fernandez-Vidana*, 857 F.2d 673, 675 (9th Cir. 1988) (finding district court judge did not err in applying "preponderance of the evidence" standard appropriate for factual findings used for sentencing). However, two Courts of Appeals have suggested that due process may require more than a mere preponderance of the evidence standard when the relevant conduct offered at sentencing would dramatically increase the sentence. *United States v. Townley*, 929 F.2d 365, 369-370 (8th Cir. 1991); *United States v. Restrepo*, 946 F.2d 654, 659-661 (9th Cir. 1991)(en banc), *cert. denied* 112 S.Ct. 1564 (1992). Additionally, in *United States v. Watts*, 519 U.S. 148 (1997), the Supreme Court recognized that there was "a divergence of opinion among the Circuits as to whether, in extreme circumstances, relevant conduct that would dramatically increase the sentence must be based on clear and convincing evidence." *Id.* at 156 (citing *McMillan v. Pennsylvania*, 477 U.S. 79, 88 (1986) (upholding use of preponderance of evidence standard where there was no allegation that the sentencing enhancement was "a tail which wags the dog of the substantive offense"); *Kinder v. United States*, 504 U.S. 946, 948-949 (1992) (White, J., dissenting) (acknowledging split among circuits over appropriate standard of proof when relevant conduct offered at sentencing would dramatically increase the sentence); *United States v. Gigante*, 39 F.3d 42, 48 (2d Cir. 1994), *as amended*, 94 F.3d 53, 56 (1996) (not reaching due process issue, but

noting: "In our view, the preponderance standard is no more than a *threshold* basis for adjustments.")

In the instant case, the government is requesting an upward variance and a sentence that is *double* that of the maximum possible sentence under the guideline calculation based on facts outside of the plea agreement. To bolster its request to double the maximum recommended sentence under the guidelines, the government in their Sentencing Position introduces as fact allegations that have never been proven in a court of law and to which the defendant never conceded.  As such, this conduct should be subjected to a clear and convincing evidence standard of proof.

**B.      OBJECTION TO THE GOVERNMENT'S CHARACTERIZATION OF MR. ZIMMERMAN HAS HAVING A "SIGNIFICANT HISTORY OF DISREGARD FOR THE LAW" AND A "DEMONSTRATED LEVEL OF SOPHISTICATION IN DEALING WITH WILDLIFE TRAFFICKING"**

In their Sentencing Position, the government claims the defendant possessed and sold a number of fish, river stingrays and live piranha, which were illegal to possess in California in 2004, but were legal in other states; the government further asserts that Mr. Zimerman misrepresented his activities with respect to such fish. Additionally, the government claims that "law enforcement, [again in 2004], also found evidence on Mr. Zimerman's computer indicating that he had used Photoshop to alter an existing CITES import permit for Arapaima gigas."

Even if the conduct alleged by the government that is outside the plea agreement in this matter is deemed true under the clear and convincing burden of proof, this hardly constitutes a "significant history of disrespect for the law."  Mr. Zimerman is a 67 year old man with, until now, no criminal history whatsoever.

Mr. Zimerman admittedly made some mistakes in the running of his business and admittedly tried to export two Arapaima gigas to Canada without a re-export cites in 2008 while on pre-trial supervision. However, Mr. Zimerman could hardly be described as a hardened criminal with no respect for the law.

Similarly, the assertion that Mr. Zimerman has a "demonstrated level of sophistication in dealing with wildlife trafficking" because he failed to procure a re-export permit before sending the fish to the purchasers in Canada and because he possessed a number of fish he wasn't supposed to have in this state, hardly constitutes "a demonstrated level of sophistication." In fact, it speaks more to sloppy business practices and management coupled with unfamiliarity with the law (which the defendant readily admits is his responsibility), than it does a level of sophistication.

Finally, the government points to the Defendant's flight to Mexico as further evidence of Mr. Zimerman's "disregard for the law." But Mr. Zimmerman's flight to Mexico has already been made part of the guideline calculation with a two level increase to his total offense level under U.S.S.G. § 3C1.1 for obstruction. As such, Mr. Zimerman's flight has already been adequately addressed under the guidelines. The government then asserts that living in exile, cut off from his family for five years, followed by seven and one half months of hell in a Mexican prison and another seven weeks in the Metropolitan Detention Center following his extradition, which he barely survived, coupled with four months of home confinement and electronic monitoring was somehow "a benefit" to Mr. Zimerman, such that his prospective sentence under the guidelines should be doubled. This notion is absurd. Mr. Zimerman's crime was victimless (with the exception of the fish which law enforcement apparently let die after their seizure in 2004). Mr. Zimerman is not a violent offender nor did his crime result in a significant loss amount to anyone. As such, Mr. Zimerman's crime is simply not

the kind of crime that typically warrants "prison for long years" as the government asserts. As such, the government's request for an upward variance outside the guideline range is unwarranted.

## IV.
## SENTENCE CALCULATION

As the Supreme Court has explained, the Guidelines are now just "one factor among several courts must consider in determining an appropriate sentence." *Kimbrough v. United States* (2007) 552 U.S. 85, 111. While the Guidelines are to be respectfully considered, they are on factor among the § 3553 factors that are to be taken into account in arriving at an appropriate sentence. *United States v. Carty* (2008) 520 F.3d 984, 991. Instead, a sentencing court must make an "individualized assessment based on the facts presented." *Gall v. United States* (2007) 552 U.S. 38. 50. Above all, a court's final determination of a sentence must reflect "§3553(a)(2)'s overarching instruction to 'impose a sentence sufficient, but not greater than necessary' to accomplish the sentencing goals advanced in 3553(a)(2)," namely retribution deterrence, incapacitation, and rehabilitation." *Kimbrough v. United States* (2007) 552 U.S. 85, 111.

The factors the court "shall consider" in determining a sentence that is sufficient but not greater than necessary" to satisfy the goals of sentencing are "(1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentencing imposed; (3) the kinds of sentences available; (4) the United States Sentencing Guideline calculation; (5) pertinent police statements; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution. 18 U.S.C. §3553(a).

/ / /
/ / /
/ / /

**A.  SECTION 3553(A) FACTORS CONCERNING THE HISTORY AND CHARACTERISTICS OF MR. ZIMERMAN WARRANT A PROBATIONARY SENTENCE**

In the instant case, the history and characteristics of Mr. Zimerman militate against a custody sentence.  Mr. Zimerman has no prior criminal record.  He has worked hard at various endeavors throughout his life to support his family and to make a contribution to both individuals and society as a whole.  "Throughout his life, my father embodied, and still does, the spirit of honest hard work in order to succeed.  No matter how hard he fell, he always got back up with a smile and kept moving forward," writes Mr. Zimerman's son, Yuval.  (See Letter from Yuval Zimerman, attached hereto as Exhibit C.)  Speaking of himself and his brothers, Yuval attests that "Our values, work ethic and success we owe to our father." (See Exhibit C.)  Mr. Zimerman has raised three upstanding successful boys and has had a strong impact on those around him.  As one family friend writes, "He taught me that integrity and character were everything.  That a strong man is kind to those weaker, and when needed stands up to those stronger…This man is kind and has always gone out of his way to help others.  He is cultured, learned and well read. He is also a gentleman and always put his family and friends before himself." (See Letter from Edo Cohen, attached hereto as Exihibit D.)  Another family friend recounts, "My father wasn't around much growing up and Mr. Zimerman welcomed me into his home like one of his own.  He is a very honorable man and made me want to be a better person in life.  He instilled strong values in me such as respect, love for your family, manners and hard work." (See Letter from Barry Dadon, attached hereto as Exhibit E.)  His neighbors write, "We have known each other since 2003 and we have not met a better person yet.  He has been a great friend to our family.  He is polite, generous, and kind in all dealings with us.  He is a class act and is trustworthy…We can't say enough about Isaac." (See Letter from

16

Lyubov Levina and Alexandre Levin, attached hereto as Exhibit F.)  As Mr. Zimerman's Rabbi writes, "I believe that Isaac is a man of integrity, an individual who has the best interest of his community at heart, and who is actively involved in the betterment of his community, and society as a whole (See Letter from Rabbi Eli M. Levitansky, attached hereto as Exhibit G.)

## B.   SECTION 3553 FACTORS CONCERNING THE NEED FOR THE  SENTENCE IMPOSED

The next factors under § 3553(a) concern the need for a particular sentence. The mandatory principle of § 3553 is a limiting one:  the sentence must be "sufficient, but not greater than necessary," to satisfy "(2) the need for the sentence imposed – (A) to reflect the seriousness of the offense, to promote respect for the law, and to  provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

## 1.   THE SERIOUSNESS OF THE OFFENSE AND THE NEED TO PROVIDE JUST PUNISHMENT

Mr. Zimerman recognizes the purpose of the CITES rules and regulations and regrets his mistake in not following proper procedure in the importation and exportation of his fish and for possessing prohibited fish in the state of California. He has expressed his regret and remorse for his choices that led to this case.  He has taken accountability and responsibility for his actions and has already paid a heavy price for those actions.  As his son, Eitan, writes to the Court, "I sincerely hope you find his punishment, having lost everything over the past 6 years

including his hard –built business, his properties, his money, his car, his health and almost his life in Mexican prison, more than sufficient." (See Letter from Eitan Zimerman, attached hereto as Exhibit H.)

Furthermore, 18 U.S.C. § 3553 mandates that the court consider the need to provide just punishment for the offense. 18 U.S.C. § 3553(a)(2)(A).  In order to determine whether a punishment is "just," a number of factors need to be considered. A "just" punishment is punishment that fits the crime and reflects the gravity of the defendant's conduct. *Simon v. United States* (2005) 361 F. Supp. 2d 35, 43.  A "just punishment" must also take into account the cost of the defendant's criminal conduct and the cost society must undertake to punish for the offense. *Id.* The punishment should not be unreasonably harsh under all of the circumstances of the case. See *United States v. Wilson* (2005) 350 F. Supp. 2d 910 (citing S. Rep. No. 98-225, at 75-76 (1983), *as reprinted* in 1984 U.S.C.C.A.N. 3182, 3258-59).

Mr. Zimerman was separated from his family for five years during his self-imposed exile. He has spent 7.5 months in one of the most notorious Mexican prisons awaiting extradition where severe over-crowding, violence, and almost intolerable conditions threaten survival.  Thereafter, he spent seven weeks in a United States Federal Detention Facility.  Finally, he has spent the last four months since his release in home confinement under electronic monitoring.  Surely he has been punished for his crimes.  Additional custody time at this point would be excessive and would serve no additional purpose.  Again, Mr. Zimerman understands and appreciates the reason the government requires CITES is to protect endangered or protected wildlife species from human harm or excesses. There was no significant cost to society in Mr. Zimerman's actions; the total cost of the two fish in Count 12 is estimated at approximately $80.00.  The cost of housing Mr. Zimerman as a Federal Inmate for any length of time, however, will be substantial in comparison.

## 2. THERE IS NO NEED TO PROTECT SOCIETY FROM FUTURE CRIMES OF MR. ZIMERMAN AND CUSTODY TIME IS NOT NECESSARY TO ACHIEVE DETERRENCE

Another factor to consider in determining the need for the sentence imposed is whether or to what extent society needs to be protected from the defendant. As noted above, Mr. Zimerman has no prior criminal history. He has dedicated his life as a father, as a husband, as an artisan, and as an entrepreneur to helping other people and to achieving success in all of his endeavors. It is fair to say that Mr. Zimerman has had his fill of fish by now, and Mr. Zimerman's actions that occurred eight and twelve years ago will not be repeated. As previously mentioned, Mr. Zimerman's health has taken a serious decline in the last year. To compound matters, Mr. Zimerman was diagnosed with shingles just a few weeks ago. Mr. Zimerman, at this juncture, wishes only to go back to Mexico and continue to develop his kamado business. As Mr. Zimerman writes, "I have been very humbled by this experience and respectfully ask you for a chance to remain free with my loving wife, who as suffered along with me. I ask for a chance to continue to prove to you that I can be a good and worthy citizen." (See Letter from Isaac Zimerman, attached hereto as Exhibit I)

## C. THE TYPES OF SENTENCES AVAILABLE

18 U.S.C. § 3582(a) provides that, "the court, in determining *whether* to impose a term of imprisonment and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in §3553(a) to the extent that they are applicable." 18 U.S.C. § 3582(a) (emphasis added). §3553(a) requires consideration of the "kinds of sentences available." 18 U.S.C. §3553(a)(33). Thus, under §3582, this Court should consider whether a term of imprisonment is appropriate in the instant case and, if some term is necessary, what types of sentences are available.

In determining *whether* to impose a term of imprisonment, it is relevant to note that in enacting the Sentencing Reform Act of 1984 ("SRA"), Congress intended that "prison resources [would be], first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society," and that "in cases of nonviolent and nonserious offenders, the interests of society as a whole as well as individual victims of crime can continue to be served through the imposition of alternative sentences, such as restitution and community service." *See* Sentencing Reform Act of 1984, Pub. L. No. 98-473, §§217(a), 98 Stat. 1987, 2039 (1984). Congress thus instructed the Commission to ensure "that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense," and the "general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury." 28 U.S.C. §994(j) (2012). Despite the statutory goals of Congress, Guideline sentences have resulted in a larger prison population.[2] As of year-end 2006, the Bureau of Prisons was 37% over capacity.[3]

---

[2] The federal prison population was 44,408 in 1986, 48,300 in 1987. *See* Katherine M. Jamieson and Timothy Flanagan, eds., Sourcebook of Criminal Justice Statistics - 1988, tbl. 6.34, Department of Justice, Bureau of Justice Statistics, Washington, DC: USGPO, 1989. Currently, the population is approximately 218,864.  See id. at tbl. 6.34 (Hindelang Criminal Justice Research Center 1989); Quick Facts About the Bureau of Prisons, www.bop.gov, (Sept. 20, 2013), http://www.bop.gov/news/quick.jsp#1.

[3] U.S. Department of Justice, Bureau of Justice Statistics Bulletin, Prisoners in 2006 5, available at http://www.ojp.usdoj.gov/bjs/pub/pdf/p06.pdf.

In the instant case, should Mr. Zimmerman receive a custody sentence, the BOP would calculate his credit for his earlier sentence. A federal prisoner's sentence calculation is governed by 18 U.S.C. § 3585.  Paragraph (a) of the statute governs the date upon which a prisoner's sentence commences and paragraph (b) governs credit for time spent in official detention prior to the date the sentence commences.  Thus, in any computation of a federal sentence, two separate decisions must be made: (1) when the federal sentence commences and (2) to what extent the defendant can receive credit for time spent in custody prior to commencement of his or her sentence. *Chambers v. Holland* (1996) 920 F. Supp 618, 621, aff'd, 100 F.3d 946. See also *Dutton v. U.S. Attorney General* (2010) 713 F. Supp. 2d 194, 199.  It is the second question in this inquiry that concerns the instant case.

The Attorney General is vested with authority to make sentencing credit determinations as set forth in 18 U.S.C. § 3585. *See United States v. Wilson* (1992) 503 U.S. 329, 333("[Section] 2385(b) does not authorize a district court to compute the credit at sentencing.") *United States v. Ifeoluwa* (2007) 238 F. App'x 895, 900 ("[t]he power to grant sentencing credit under § 3585(b) is vested with the Attorney General of the United States.")  The Attorney General, under 28 C.F.R. § 0.96 delegated this authority to the Bureau of Prisons ("BOP"). *United States v. Bram* (1993) 990 F.2d 98, 103-04.  The BOP policies regarding sentence computation are not published in any federal regulation, and thus are not subject to public notice and comment before adoption.  They are set forth in Program Statement 58980.28, Sentence Computation Manual (PS 5880.28).

The BOP, and not the federal sentencing court, determines the date upon which a federal sentence commences.  The second calculation concerning prior custody credit must then be determined.  Prior custody credit is governed by 18 U.S.C. § 3585(b), which provides:

21

(a)   Credit for prior custody – A defendant shall be given credit toward the sentence of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences –

(1)   As a result of the offense for which the sentence was imposed, or

(2)   As a result of any other charge for which the defendant was arrested after the commission of the offense for which the sentence was imposed;

That has not been credited against another sentence.

18 U.S.C. § 3585(b).

The intent of the last clause of § 3585(b) is to prohibit double sentencing credit situations. *United States v. Wilson* (1992) 503 U.S. 329, 337. Thus, it is the BOP that will ultimately determine what credit Mr. Zimerman is allowed. Mr. Zimerman has already served nine months in custody, followed by four months of home confinement in this case, which is above the maximum guideline range. Under the BOP policies, the defendant should receive credit for his entire time of incarceration, first in Mexico and then in the United States. However, Mr. Zimmerman may have to go back into custody while BOP makes its determination, which would mean he would do even more time above the guideline maximum. To avoid this disparate result, this Court should, taking into account the amount of time already served, impose a time served or, in the alternative, probationary sentence, which would ensure that Mr. Zimmerman would not have to go into custody to await BOP's calculation. Surely the government, under the circumstances, has received its pound of flesh from Mr. Zimerman and he should be allowed to return to Mexico, as is his wish, to move on with his life, and continue to develop his kamado business.

/ / /

/ / /

/ / /

## V.
## CONCLUSION

For the reasons set forth herein, Mr. Zimerman respectfully requests this Honorable Court impose a sentence of time-served with no period of supervised release, or in the alternative, impose a probationary sentence.

DATED: January 29, 2016                    Respectfully submitted,


                                           By: _____
                                               Mark J. Werksman
                                               Nina E. Daly
                                               Kelly C. Quinn
                                               Attorneys for Defendant
                                               Isaac Zimerman